In re Lillie CARTER, Debtor.

No. 04 B 00114.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

May 4, 2004.

Greg Elsnic, Chicago, IL, Attorney for Movant.

Kelvin C. Bulger, Chicago, IL, Attorney for Respondent.

### MEMORANDUM OPINION

JACQUELINE P. COX, Bankruptcy Judge.

The Movant Cronus Projects, LLC ("Cronus") requests relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) or for dismissal with a 180–day bar against refiling pursuant to 11 U.S.C. § 1307(c) and § 349(a) so that it may seek dispossession of Chapter 13 debtor Lillie Carter ("Carter") from real property at 856 North Trumbull, Chicago, Illinois.

First mortgagee Ocwen Federal Bank sued Carter in 2002 to foreclosure its lien on her home. (Case No. 02 CH 208) After Carter reached a settlement agreement in this foreclosure suit with Ocwen, she still faced a foreclosure suit by the second mortgagee PB Investment Corporation, which had filed an April 2002 cross claim against her in the first mortgagee's original foreclosure suit. The state court entered a judgment of foreclosure on December 9, 2002, setting a March 10, 2003 statutory deadline for Carter to redeem her home from PB Investment Corporation's secured claim. On April 18, 2003, Cronus successfully bid $30,000 at the mortgage foreclosure sale initiated by the second mortgagee, and the Circuit Court of Cook County confirmed the same on August 26, 2003. The confirmation order rejected Carter's defense based on lack of personal jurisdiction and separately direct-

ed the sale officer to execute and deliver a deed for the property to Cronus.

At the conclusion of the confirmation hearing, the president of Cronus informed Carter that she could retain her primary residence if she reimbursed the company for the $30,000 it paid at the sale, and Carter consented to this arrangement. Accordingly, Cronus and Carter agreed to extend the state-court order for possession, which normally accompanies a sale-confirmation order, several times between August and December of 2003. The relationship and negotiations broke down definitively in a December 19, 2003 letter to Carter's attorney in which Cronus notified her that it would not sell the property to her and indicated it would not continue to agree to extensions of the order for possession. The breakdown precipitated Carter's instant Chapter 13 bankruptcy filing on January 2, 2004, twenty-one days before the final postponement of the order for possession was set to expire.

Since September, Carter had been seeking funds to "refinance" her second mortgage debt (even though it had been paid off at the foreclosure sale) from Challenge Mortgage. Challenge ultimately informed her that it could not process her loan due to the confusion surrounding her apparent lack of ownership on the title chain, which revealed that the property had been placed in a trust by the movant Cronus. Carter attributes her inability to obtain refinancing to this transfer to a trust as well as to the fact that Cronus advertised her home in a real-estate listing beginning on May 6, 2003, and continuing until it obliged her request to remove it from the listings on October 9, 2003.

## Discussion and Analysis

■ Cronus argues that the automatic stay should be modified to permit the state-court order for possession to issue under 735 Ill. Comp. Stat. 5/15–1508(g) (2002), alleging that "cause" for relief has been established because Carter no longer holds any property interest in her home other than a mere possessory interest. It relies on *Colon v. Option One Mortgage Corporation*, 319 F.3d 912 (7th Cir.2003), for its assertion that Carter's Chapter 13 case has been filed too late to save her home under the Bankruptcy Code.

In *Colon*, the Seventh Circuit held that when a Chapter 13 case is filed in between a foreclosure sale and an Illinois court's confirmation of that sale, the "sale" described in 11 U.S.C. § 1322(c)(1)[1] has already occurred, and the debtor-mortgagor may no longer cure the default resulting in foreclosure by means of a plan utilizing the permissive cure provisions of § 1322(b), at least not if an Illinois circuit court ultimately confirms the sale after the bankruptcy court grants relief from the auto-

---

**1.** (b) Subject to subsections (a) and (c) of this section, the plan may—...

 (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;
 (3) provide for the curing or waiving of any default; ...
 (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; ...
 (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—
 (1) a default with respect to, or that gave rise to, a lien on the debtor's principal residence may be cured under paragraph (3) or (5) of subsection (b) until such residence is sold at a foreclosure sale that is conducted in accordance with applicable nonbankruptcy law;
 11 U.S.C. § 1322

matic stay to permit the confirmation hearing. *See id.* at 916, 920–21. Thus, the debtor herein is clearly out of time with respect to the most common method of using Chapter 13 of the Bankruptcy Code to prevent dispossession of a private residence, § 1322, as the sale and the confirmation hearing have both already occurred. The provision in her modified Chapter 13 plan allowing her to pay her mortgage arrears throughout the course of her five-year plan would require denial of confirmation under *Colon.*

### A. Does the Debtor Still Have a Lingering Equitable Right of Redemption Under Illinois Law?

The debtor in this case nevertheless argues that she had a lingering state-law equitable right of redemption that existed both after sale confirmation and on the bankruptcy-petition filing date; the right supposedly stems from Cronus's inequitable conduct impeding her from "refinancing" her home after Cronus agreed that she could do so. If the legal argument is correct, the right became property of her bankruptcy estate pursuant to 11 U.S.C. § 541(a), and the time to exercise this right would have been extended for 60 days after the petition date pursuant to § 108(b) if it would have otherwise expired during the 60 days. *See, e.g., Matter of Tynan,* 773 F.2d 177, 179 (7th Cir.1985) (noting under the superceded foreclosure statute that "[w]hen the Chapter 13 petition was filed, the statutory right of redemption was an asset that passed to the trustee ... [but that] [t]he real property sold at the sheriff's sale did not become part of the estate."); *Johnson v. First Nat. Bank of Montevideo,* 719 F.2d 270, 276–78

(8th Cir.1983) (same). If correct, the argument would also mean that rather than curing a default on the second mortgage by paying the arrears throughout the course of a payment plan under § 1322(b)(5), the debtor would have to come up with a lump-sum redemption amount [2] within the applicable time frame.

Carter's belief that she still had a redemption right in spite of Cronus's refusal to further acknowledge one is based on three Illinois decisions, *Woodworth v. Sandin,* 371 Ill. 302, 20 N.E.2d 603 (1939), *Henderson v. Harness,* 184 Ill. 520, 56 N.E. 786 (1900), and *Skach v. Sykora,* 6 Ill.2d 215, 127 N.E.2d 453 (1955). She asserts that these decisions stand for the proposition that a debtor can utilize an extended equitable period of redemption beyond the statutory period if the foreclosure-sale purchaser engages in fraud or other inequitable conduct. In *Henderson v. Harness,* 184 Ill. 520, 56 N.E. 786 (1900), the purchaser induced the prior owner to refrain from redeeming the land within the statutory period so that the purchaser, who was purportedly not interested in obtaining the property in lieu of purchase-price repayment, could obtain a precedent-setting ruling in the underlying judgment-execution action. *Henderson,* 56 N.E. at 787–88, 790. When the prior owner later procured and offered the purchase price plus interest after the redemption period expired, the sale purchaser refused it. *See id.* An Illinois court of equity granted a bill in chancery vacating the purchaser's certificate of sale and deed so that the redemption could be accomplished, relying in part on the broken

---

**2.** The amount needed to accomplish redemption is the sum of all principal and accrued interest due on the date of redemption in addition to various costs, expenses, attorneys' fees, senior mortgage payments, and property taxes for which the mortgagee may be reimbursed under the mortgage agreement and applicable state law. *See* 735 Ill. Comp. Stat. 5/15–1603(d) (2002). Apparently, the mortgagor/debtor would have to pay the second mortgagee this total amount even if such second mortgagee were undersecured.

promise and in part on the gross disparity between the value of the land and the sale price; the Supreme Court of Illinois affirmed. *See id.* at 789–91.[3] *Skach v. Sykora,* 6 Ill.2d 215, 127 N.E.2d 453 (1955), is similar in holding that "fraud or improper acts of the purchaser" can extend the statutory redemption period when those acts cause the delinquency. *See id.,* 127 N.E.2d at 455. In that case, the mortgagors borrowed money to pay the redemption amount and tendered what the master reported as the redemption amount within the statutory time frame, which at that time was twelve months from the sale date. *See id.* at 454–55. When they later discovered that the master calculated the interest incorrectly after the deadline had passed, they tendered the difference, causing the master to eventually deny the sale purchaser a deed in return for the certificate of sale. *See id.* at 454. The Supreme Court of Illinois held that three considerations required affirmance of the lower court's equitable extension of the redemption period: the honest attempt to redeem within the applicable time frame, the mistake of the master in computing the original redemption amount, and the disparity between the sale price and the fair market value of the mortgaged property. *See id.* at 456–57. Under the modern Illinois

Mortgage Foreclosure Law, an equitable right of redemption can extend the time for redemption beyond the statutory period delineated in 735 Ill. Comp. Stat. 5/15–1603(b)(1). *See* 735 Ill. Comp. Stat. 5/15–1605; *Colon v. Option One Mortg. Corp.,* 319 F.3d 912, 919–20 & n. 7 (7th Cir.2003). In this general respect, *Henderson* and *Skach* are consistent with modern Illinois law.

## 1. The Equitable Right of Redemption Under Modern Illinois Foreclosure Law

To determine whether a state-law right of redemption became part of Carter's bankruptcy estate, these cases must be examined in light of the current version of the mortgage-foreclosure statute in the Illinois Code of Civil Procedure, which became effective during July 1987. Under the former law, the statutory redemption period expired after the foreclosure sale; therefore, any equitable extension thereof resulting from the purchaser's inequitable conduct necessarily had to occur after the sale as well. *See Skach v. Sykora,* 6 Ill.2d 215, 127 N.E.2d 453, 454–55 (1955); *Henderson v. Harness,* 184 Ill. 520, 56 N.E. 786, 787, 789–90 (1900). The modern statute, though, is inconsistent with the

---

**3.** *Woodworth v. Sandin,* 371 Ill. 302, 20 N.E.2d 603 (1939), favorably cites *Henderson* but is of little further use in this case. In *Woodworth,* the court actually affirmed the dismissal of the mortgagor's complaint requesting equitable relief from a foreclosure sale because the mortgagor answered the foreclosure complaint, received notice of the foreclosure sale, did not at any time present defenses to the underlying merits of the foreclosure suit, and did not offer the redemption amount to the master at the sale. *See id.,* 20 N.E.2d at 606. In the case at bar, the former property owner has likewise never asserted any defenses that go to the underlying merits of the second mortgagee's foreclosure lawsuit and has never been able to offer the full redemption amount at any time.

The Supreme Court of Illinois in *Woodworth* did note generally, though, "that equity will grant relief where the purchaser at a mortgage foreclosure sale has, by fraudulent conduct, prevented the owner of the equity of redemption from redeeming within the statutory time." *Id.* The statutory period of redemption in this case expired in March of 2003, but Carter's allegations of inequitable or fraudulent conduct by Cronus relate to a time period subsequent to April 18, 2003, the date Cronus first became involved in the foreclosure proceeding by successfully bidding at the foreclosure sale. Therefore, whatever Cronus may have done wrong in this case could not have caused Carter to miss the earlier statutory deadline for redemption.

underlying foreclosure law in *Henderson* and *Skach* in several respects. First, the statutory redemption period[4] now expires *before* the foreclosure sale may occur, *see* 735 Ill. Comp. Stat. 5/15–1507(b); *Colon,* 319 F.3d at 920; *In re Josephs,* 93 B.R. 151, 152–53 (N.D.Ill.1988), and if redemption does not occur, then the real estate "shall be sold," 5/15–1603(h). Quite significantly, Illinois law says that once this statutory redemption period expires, it "shall not be revived," 5/15–1603(c)(1), and only a *prior* court order or federal statute staying the running of the statutory redemption period can prolong it, *see* 5/15–1603(c)(1)–(2). Not even a mistaken omission of the last date for redemption in the judgment of foreclosure can "extend the time for redemption." 735 Ill. Comp. Stat. 5/15–1506(e) (2002).

As stated above, Illinois law does still recognize a further equitable right of redemption extending beyond the statutory period. Most importantly, though, this lingering equitable right of redemption has an explicit temporal limit like the statutory right and cannot be exercised or enforced subsequent to the judicial sale. *See* 5/15–1605; *Colon,* 319 F.3d at 919–20 & n. 7. Moreover, a mortgage foreclosure complaint is automatically deemed to state that the mortgagee requests that, in the event redemption is not accomplished before the sale, the mortgagor will be "forever barred" from claiming "any . . . right to redeem" real estate so that the purchaser will be issued a deed for the property. *See*

5/15–1504(e)(5)–(6). Equitable redemption after a foreclosure sale is only technically possible if the presiding Illinois court later denies confirmation of that sale, *see Colon,* 319 F.3d at 920–21, meaning that the sale was invalid in the first place and would need to be reperformed. But in the case at bar, this condition has not occurred.

When the Illinois legislature contemplates redemption after sale confirmation in special circumstances, it makes that right explicit. For instance, when the purchaser at a residential foreclosure sale is also a party to the foreclosure lawsuit and the sale price is less than the original redemption amount, a former owner of redemption then has a "special right to redeem" during the thirty-day period following the sale-confirmation order by paying the lower sale price plus costs and interest. *See* 5/15–1604(a). In this case, the purchaser Cronus was not a party to the foreclosure lawsuit, and the special right was not applicable.

The inevitable conclusion is that *Skach* and *Henderson* have been superceded by statute, and Carter's reliance on them is misplaced to the extent she believed that her right of redemption in any form still existed at the confirmation hearing on August 26, 2003. Simply put, redemption was a legally impossible option at the time that Carter and Cronus agreed to allow Carter to retain or repurchase her fee simple interest in her home. In *Henderson,* the equitable right of redemption under the old foreclosure system

---

4. An owner of redemption may only exercise the statutory redemption right within the defined period. *See* 735 Ill. Comp. Stat. 5/15–1603(a). The statutory redemption period for the type of foreclosure action involved here ends

on the later of (I) the date 7 months from the date the mortgagor or, if more than one, all the mortgagors (A) have been served with summons or by publication or

(B) have otherwise submitted to the jurisdiction of the court, or (ii) the date 3 months from the date of entry of a judgment of foreclosure.

735 Ill. Comp. Stat. 5/15–1603(b)(1). In the present case, Carter has not denied Cronus's allegation that the statutory redemption period expired during March of 2004 and prior to the April foreclosure sale.

stemmed from the fact that the sale purchaser caused the mortgagor to miss a post-sale statutory redemption period. In this case and in many others, the eventual sale purchaser such as Cronus is not even in the picture at the time the statutory redemption period expires.

### 2. Sale Confirmation Under Modern Illinois Foreclosure Law

■ The legal rights that sale-purchaser Cronus obtained as a result of the August 2003 confirmation of the sale are flatly inconsistent with a resident/mortgagor's refinancing of the mortgage giving rise to the foreclosure proceeding. They are additionally inconsistent with a true continuing redemption period, which is a time during which a mortgagor still holds the legal and equitable interest in his or her real property, *see Colon v. Option One Mortg. Corp.,* 319 F.3d 912, 920 n. 8 (7th Cir.2003) (quoting *Van Fleet v. Van Fleet,* 126 Ill.App.3d 448, 81 Ill.Dec. 721, 467 N.E.2d 592, 595 (1984)). Upon confirmation of a judicial foreclosure sale, the interests of a party to the suit in the mortgaged property are terminated. *See* 5/15–1404. After sale confirmation and full payment of the purchase price, the court must grant the holder of the certificate of sale a deed sufficient to transfer title, *see* 5/15–1509(a), and the delivery of this deed is sufficient to convey title to the purchaser or other holder of the certificate of sale, *see* 5/15–1509(b); *Colon,* 319 F.3d at 920 n. 8. Additionally, the holder of the certificate of sale is entitled to a possession order against the foreclosure-suit party with terminated rights, *see* 5/15–1508(g), although in this case the state court permitted Carter and Cronus to agree to an effective date past the 30–day delay period subsection "(g)" imposes on the possession order. One cannot "refinance" real property one does not own.

Several of Carter's arguments in favor of an equitable post-sale confirmation redemption period are really related to issues that could and should have been addressed at the sale confirmation hearing. Foreclosure sales can be voided at the confirmation hearing on four limited grounds:

> (I) a notice required in accordance with subsection (c) of Section 15–1507 was not given, (ii) the terms of sale were unconscionable, (iii) the sale was conducted fraudulently or (iv) that justice was otherwise not done....

735 Ill. Comp. Stat. 5/15–1508(b). If, as Carter alleges, Cronus's listing of the property for resale before the confirmation of its own sale was fraudulent or was otherwise unjust or unconscionable, this challenge should have been made at the confirmation hearing. If Carter did not discover these real-estate listings until after confirmation, she should have pursued a motion to vacate the confirmation order within 30 days on the ground of newly discovered evidence, 5/2–1203, or sought relief from a final order or judgment for the same reason after 30 days, 5/2–1401. Carter also continues to argue that the foreclosure action on the second mortgage was invalid for lack of personal jurisdiction because she was never adequately served with a summons on the cross claim, although the state court explicitly rejected this argument by separate order before issuing the confirmation order. If this ruling was incorrect as a matter of law, it should have been appealed or vacated rather than collaterally attacked in this bankruptcy case. (Federal courts of original jurisdiction generally do not have appellate jurisdiction to hear challenges to or otherwise review state court rulings according to the *Rooker–Feldman* doctrine.) As far as notice is concerned generally, if Carter had not been given appropriate notice of the April 2003 foreclosure sale it-

self, this deficiency would have presumably given her a right to have the sale invalidated according to one of the four criteria set forth in 5/15–1508(b)–(c). Carter was entitled to notice of the April 2003 sale if she was a party in the action who had appeared and who had not been found to be in default for failure to plead. 5/15–1507(c)(3). Apparently some confusion resulted because of the two sets of pleadings involved in two related foreclosure actions, but even if Carter was somehow not separately served with regard to the second mortgagee's foreclosure action, she would have been able to prevent confirmation (and loss of title) if there had been a real problem regarding her notice of the most important event in a foreclosure proceeding—the sale itself. Again, the issues Carter has raised should affect foreclosure-sale confirmation; they do not affect the length of the redemption period, at least not once the equitable and statutory periods have both expired.

█ It is unfortunate that the parties bargained in terms of an agreement to permit Carter to refinance an extinguished mortgage note secured by property in which she no longer had an interest. Litigants are obviously encouraged to bargain for and reach settlement agreements for legal disputes, and the law generally will enforce the resulting contractual obligations if all legal requirements have been met. *Green v. Safeco Life Ins. Co.*, 312 Ill.App.3d 577, 245 Ill.Dec. 140, 727 N.E.2d 393, 396–97 (2000). These bargains, whether they be settlement agreements or real-estate contracts, do not exist in a void and should be entered with regard for and knowledge of closely related statutory authority. Not all statutes create mere rules of construction that can be avoided if the parties agree otherwise; some of them are in fact rules of law and not rules of construction used to fill in gaps in contracts. *See, e.g., Continental Illinois Nat'l Bank & Trust Co. of Chicago v. Llewellyn*, 67 Ill.App.2d 171, 214 N.E.2d 471, 481, 484 (1966). A statute that creates a "positive rule of law" cannot be modified or negated by contracts between private parties. *See In re Estate of Powless*, 315 Ill.App.3d 859, 248 Ill.Dec. 403, 734 N.E.2d 111, 115 (2000); *Green v. Safeco Life Ins. Co.*, 312 Ill.App.3d 577, 245 Ill.Dec. 140, 727 N.E.2d 393, 397 (2000); *Parker–Washington Co. v. City of Chicago*, 267 Ill. 136, 107 N.E. 872, 874 (1915). Under the Illinois Mortgage Foreclosure Law, a detailed and specific procedure is established for passing title from a mortgagor to a foreclosure-sale purchaser and for satisfying the mortgagee's secured claim. To that end, the legislature saw fit to have foreclosure-sale bidding free from any lingering doubt resulting from a continuing indefinite right to redeem, splitting up the issuance of the foreclosure judgment and the sale so that the mortgagor could accomplish redemption, if at all, in between. *See generally In re Josephs*, 93 B.R. 151, 152–53 (N.D.Ill.1988). It also devised a final confirmation hearing for adjudicating the kind of issues Carter raises before residential mortgagors are finally and definitely stripped of their fee simple interests. This scheme does not create mere rules of construction permitting a debtor/mortgagor to indefinitely prolong the expiration of the redemption period or to prevent passage of title, at least not if the operative legal events (sale and confirmation) occur.

*B. The Legal Status of the Agreement the Parties Reached at the Sale Confirmation Hearing*

The question of what sort of agreement the parties reached immediately after confirmation on August 26, 2003 remains for consideration. The fact that redemption was legally impossible at that time does

not mean that they were prohibited from entering into other kinds of valid contracts. Cronus has not denied the allegation that at the conclusion of the August 26, 2003 confirmation hearing, it offered to let Carter retain the fee simple interest in her personal residence in exchange for the purchase price paid plus interest, and Carter accepted this offer. Cronus contends that the arrangement was a mere gratuity and that it could have withdrawn the offer at any time, while Carter counters with the assertion that the agreement created a binding contract.

■■ The black-letter law of contracts, of course, is that unless a specific statute dictates otherwise, one party's acceptance of another party's offer creates a contract, and the latter party's offer can no longer be withdrawn or revoked once the original offer is transformed into a binding promise. *Bournique v. Williams*, 225 Ill.App. 12, 1922 WL 2441, at *4 (1922). Further, a party's promise to perform a future act that he or she is not already legally obligated to perform in exchange for another party's counter–promise to perform a related future act normally constitutes sufficient consideration to form a contract. *See Crum v. Krol*, 99 Ill.App.3d 651, 657, 54 Ill.Dec. 864, 425 N.E.2d 1081, 1086 (1981). Here, Carter had no prior obligation to pay money to Cronus, which was the purchaser of her property at the foreclosure sale and not the second mortgagee to whom she previously owed money; Cronus similarly had no prior obligation to convey its interest in Carter's home back to her after sale confirmation, because both types of redemption periods had expired (as discussed *supra*). The necessary conclusion, then, is that the parties herein did form a contract concerning 856 North Trumbull during August 2003. The meeting of the minds is evidenced by Cronus's subsequent consent to remove the property from the real-estate listings, by its provision of a mortgage payoff letter to Challenge Financial Investment listing the balance due as $34,429.53, and by its agreements to extend the order for possession in the state-court foreclosure action. Cronus's counsel's statement in the December 19, 2003 letter to the effect that Cronus had no legal obligation to sell the property back to Carter was a self-serving conclusion and was inconsistent with the parties' prior agreement and course of conduct.

Nonetheless, a question remains as to what the specific terms of this contract were, and this question creates at least two types of problems that preclude its enforcement in this Chapter 13 bankruptcy case. Because no formal written agreement ever materialized between the parties, the Court cannot determine exactly whether the contract was one to extend the redemption period for refinancing or one to allow Carter to repurchase her former interest in the property from Cronus. Carter runs into obstacles either way.

### 1. Could the Contract Be Rescinded Due to a Mutual Mistake of Law?

■ To the extent the agreement is construed as a contract to extend the redemption period, the Court has already concluded that fulfillment of such an agreement was legally impossible. If this was really the agreement, it was based on both parties' apparent misapprehension of Illinois foreclosure law, which would have ramifications under Illinois contract and equity jurisprudence were Cronus to pursue rescission of the agreement. Illinois case law has substantially eroded the general rule that contracts may be rescinded or reformed only when the parties have made a mutual mistake of fact, not a mutual mistake of law. *See Estate of Hurst v. Hurst*, 329 Ill.App.3d 326, 263 Ill.Dec. 853, 769 N.E.2d 55, 60–62 (2002); *Harbaugh v.*

*Hausman,* 210 Ill.App.3d 715, 155 Ill.Dec. 342, 569 N.E.2d 523, 526–28 (1991); *Barkhausen v. Continental Ill. Nat'l Bank & Trust Co. of Chicago,* 3 Ill.2d 254, 120 N.E.2d 649, 657–58 (1954). Illinois law now recognizes the equitable remedy of rescission when two parties enter into a contract based on a mutual misunderstanding of the law governing their antecedent legal rights. *See Harbaugh,* 155 Ill.Dec. 342, 569 N.E.2d at 526–28. The law is less well settled when two parties mutually mistake the legal effect of the particular document they are about to effectuate, and that document later is subject to litigation. *Compare Holbrook v. Tomlinson,* 304 Ill. 579, 136 N.E. 745, 747 (1922); *Harbaugh,* 155 Ill.Dec. 342, 569 N.E.2d at 526–28 [5] *with Hurst,* 263 Ill.Dec. 853, 769 N.E.2d at 61–62 (reforming promissory note even though mistake did not concern an "antecedent existing legal right" but rather concerned legal effect of note itself); *Barkhausen,* 120 N.E.2d at 651, 657–58 (reforming trustee's mortgage assumption agreement mistakenly imposing personal liability on beneficiaries of trust).

In this case, Carter claims that in open court on August 26, 2003, the president of Cronus offered to give her more time to effect a redemption through refinancing in spite of the final confirmation order. If true, this information would seem to indicate that both parties were mistaken about the nature and contours of the right of redemption, and since the issue arose spontaneously in court without prior negotiation, neither party was able to flesh out precise legal details before the agreement was formed in court the same day. The mistake was not about the intended effect of the August 2003 agreement itself but was instead regarding the prior legal significance of the April foreclosure sale, its confirmation, and the timing of the equitable right of redemption. The mistake of both parties continued at least until September 23, 2003, when Cronus provided a payoff letter listing a mortgage with a balance of $34,429.53 instead of listing a contract price for the same amount. (No evidence in this case has ever suggested that Cronus purchased PB Investment's second mortgage and note instead of purchasing the real estate at the foreclosure sale. This critical distinction has been repeatedly overlooked in this matter.)

The procedural posture of this contested matter is such that the Court must determine whether the automatic stay should be modified to permit a state-court order for possession to issue and not whether a contract should actually be rescinded—an issue not identified or briefed by the parties. Nevertheless, the possibility of rescinding a contract to extend a nonexistent redemption right favors relief from the automatic stay, in spite of the parties' agreement to allow the debtor to retain her home.

### 2. What Were the Specific Terms of Any Agreement to Repurchase and Did Cronus Breach Those Terms?

 Another interpretation of the oral contract is that the parties agreed to allow Carter to repurchase the property for the foreclosure-sale purchase price of $30,000.00 plus interest rather than to extend the redemption period. Assuming *arguendo* that no statute-of-frauds limita-

---

**5.** "*Holbrook* has been relied upon to deny relief from instruments entered into with a mistake as to the legal significance of that instrument in *Joseph v. Lake Michigan Mortgage Co.* (1982), 106 Ill.App.3d 988, 62 Ill. Dec. 637, 436 N.E.2d 663, *McCarthy v.*

*McCarthy* (1956), 9 Ill.App.2d 462, 133 N.E.2d 763, and *In re Estate of McIlrath* (1934), 276 Ill.App. 408."
*Harbaugh v. Hausman,* 210 Ill.App.3d 715, 720, 155 Ill.Dec. 342, 569 N.E.2d 523, 527 (1991).

tion prohibits enforcement of the sale agreement, the Court is highly skeptical that the contract did not expire according to its own terms prior to Carter's resort to federal jurisdiction on January 2, 2004. In other words, Carter has not proven that the terms of the contract included a right to repurchase for an indefinite period of time or even for a term certain lasting until Carter filed this bankruptcy case. Real estate contracts requiring financing by the purchaser routinely contain provisions that place a time limit on the purchaser's procurement of loan proceeds, and if the purchaser fails to obtain the requisite financing in time and leaves the condition precedent unsatisfied, the contract terminates according to its own terms. The debtor in the case at bar has failed to establish that any contractual rights she did have included an open-ended time frame for the repurchase—or even one that extended for four and a half months. This failure would at very least prevent her from compelling Cronus to transfer its fee simple interest in her home back to her under Illinois law. " '[T]o justify a decree of specific performance of an oral contract to convey or devise real estate, the proof of the contract must be clear, conclusive, and so convincing as to leave no doubt in the mind of the court.' " *McMillan v. Ingolia,* 87 Ill.App.3d 727, 730, 43 Ill.Dec. 162, 410 N.E.2d 162, 165 (1980) (quoting *Moehling v. W.E. O'Neil Constr. Co.,* 20 Ill.2d 255, 265, 170 N.E.2d 100, 106 (1960)). Property of the bankruptcy estate under § 541(a)(1) thus did not include an equitable right to specific performance of the oral contract in this case.

Even if Carter does not have a right to specific performance, she could theoretically still have a regular breach-of-contract claim against Cronus for money damages, at least if her allegations that Cronus purposely and actually impeded her securing a new mortgage are in fact substantial. The two types of inequitable conduct Carter uses to support an extended redemption period are best seen as arguments that Cronus breached the contract to sell the property back to Carter. The question of breach is difficult to answer without knowing the precise terms of the oral contract, and significant questions exist surrounding the ultimate reason for Carter's inability to finance a repurchase. No doubt Carter's misunderstanding of her task as one requiring refinancing (rather than original financing for the purpose of repurchase) contributed to her inability to obtain a new loan, as Challenge Mortgage rightly questioned Carter's ownership of the property. The fact that, regardless of who held the fee simple interest, the property was already subject to a substantial first mortgage contributed something else to the challenge, but that obstacle was not Cronus's responsibility.

Carter faults Cronus for placing her home in trust, thereby impeding her ability to "refinance." Cronus's conduct would appear to be an improper burden or a breach only if the August 2003 agreement is construed as an agreement to extend the redemption period and allow Carter to refinance property she herself owned. However, the second interpretation of the deal (and the one we are using here) is the repurchase interpretation—the one that is more consistent with Illinois Mortgage Foreclosure Law. The judicial confirmation order established Cronus's right to the fee simple interest, and the ability to place the real property in trust was necessarily part and parcel of this interest. To establish a breach, Carter would need to reveal more detail about the nature of the trust to prove that it—not the erroneous conception of her task as a "refinance"—was actually responsible for thwarting her efforts to buy back the property. For instance, was the transfer made to an irrevo-

cable trust, or could Cronus have easily taken the property out of trust had she lined up the financing she needed to repurchase? If the trust documents granted substantial discretionary control over the trustee to Cronus, could Cronus have directed the trustee to sell Carter the real property directly from the trust? The transfer of Carter's residence to a trust cannot be deemed an unfair impediment or a breach without more information about how the trust actually obstructed a sale of the home back to her.

The fact that Cronus listed the property for sale to third parties on May 6, 2003 and placed it in a trust on June 5, 2003—all before the state court confirmed its purchase of the property through the foreclosure sale—is more troubling. Nevertheless, this Court has absolutely no basis or authority under modern Illinois Mortgage Foreclosure Law for using such acts to convert an expired equitable redemption right back into a property right. Perhaps these acts could have justified denial of foreclosure-sale confirmation because "justice was otherwise not done," 735 Ill. Comp. Stat. 5/15–1508(b), or supported vacation of the confirmation order, as discussed above. They may have given rise to a cause of action in favor of a third party who purchased the property from Cronus when Cronus did not actually have title, but that suit would have to be plead and litigated in a separate proceeding. If this cause of action were the common law tort of fraud, Carter would have difficulty showing that Cronus's acts were false representations of ownership made to her personally and that she relied on the real-estate listings to her detriment. Cronus's inclusion of Carter's residence on the real-estate listings does not appear to be a material breach of the contract to resell to Carter, because Cronus removed it from such listings on or about October 9, 2003 at Carter's insistence, and Carter still was unable to procure financing by December ·2003, a full two months later. As discussed above, Cronus's placing the property in trust was not necessarily inconsistent with the contract to sell it back to Carter (at least not without more information about the trust), and surely after confirmation, its fee simple interest included the right to place ownership in a trust. Furthermore, placing the property in trust before sale confirmation, while troubling, may have been harmless as long as Carter had no definitive ground for eventually blocking sale confirmation.

### C. The Propriety of Dismissing This Chapter 13 Case with a Bar Against Refiling

■ Cronus alleges that Carter filed this case for the sole improper purpose of delaying or thwarting its pursuit of the order for possession that was likely to issue in the state-court foreclosure pro·ceeding. In the alternative, it has accordingly sought dismissal of this case with a 180–day bar to refiling under § 1307(c) and § 349(a) of the Bankruptcy Code.

The docket and schedules in this case reveal that in addition to the creditors holding claims against and interests in the personal residence at 856 North Trumbull, Carter has over 20 unsecured creditors. Carter has not engaged in recent serial Chapter 13 filings and also successfully avoided a Chapter 13 trustee's motion to dismiss her case. Furthermore, it appears that she has been making monthly payments of disposable income in good faith under her proposed payment plan for the purpose of collectively dealing with her entire creditor body.

■ Under the totality of these circumstances, relief under § 1307(c) and § 349(a) is not appropriate, as Carter has not abused the bankruptcy process. Especially under § 349(a), which permits the

Court to go beyond the 180–day bar to refiling in § 109(g),[6] the relief available is extraordinary and requires a showing of exceptional circumstances beyond the three grounds listed under § 109(g), none of which has yet occurred in this case.

## CONCLUSION

Because the debtor no longer has an interest in the property located at 856 North Trumbull other than a bare possessory interest, Cronus's motion for relief from the automatic stay is GRANTED for "cause." *See In re Cook,* 253 B.R. 249, 252–53 (Bankr.E.D.Ark.2000).

Cronus's motion to dismiss with a 180–day bar is DENIED.

---

6. "(g) Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—(1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case; or (2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title." 11 U.S.C. § 109(g).